[Crim. No. 869. First Appellate District, Division Two.—February 2, 1920.]

## THE PEOPLE, Respondent, v. EPHRAIM NORTHCOTT, Appellant.

[1] CRIMINAL LAW—PROSECUTION FOR MURDER—SUFFICIENCY OF IN-STRUCTION.—In a prosecution for the crime of murder in the second degree, the death having resulted from the performance of an unlawful abortion, if there is no evidence of a lesser offense, an instruction with reference to the crime of murder in the second degree is all that is necessary.

[2] ID. — COMMISSION OF ABORTION — LAWFULNESS OF OPERATION — PHOTOGRAPH OF PLACE WHERE BODY FOUND ADMISSIBLE.—In such prosecution, a photograph showing the place where the body was found, with the surrounding brush and trees, was relevant to show that the body had been placed in a secluded spot, where it was unlikely that it would be found, thus indicating that a crime had been committed and that the woman had not died as the result of a lawful operation.

[3] ID.—HANDLING OF BODY AFTER DEATH—ADMISSIBILITY OF PHOTOGRAPH.—In such prosecution, a photograph of the body taken shortly after it was found showing bruises on the head and face was relevant to indicate that the nature of the bruises was not such as to have contributed to the death and as indicating that the body had not been carefully handled and that, therefore, it was unlikely that it could have been brought for any considerable distance before having been deposited where it was found.

[4] ID.—PHYSICAL CONDITION OF DECEASED PRIOR TO DEATH—DESIRE FOR RELIEF—TESTIMONY OF OTHER DOCTOR ADMISSIBLE.—In such prosecution, testimony of a doctor that the deceased had visited his office, told him of her condition of pregnancy of four or five months' duration and asked him to perform an abortion upon her, that he refused and gave her the name and address of the defendant, which she wrote in his presence upon a card, was admissible, not for the purpose of proving the abortion, but for the purpose of showing her physical condition shortly before her death and her desire to be relieved thereof.

[5] ID.—PREPARATION OF PLACE FOR HANDLING ABORTION CASES—STATEMENTS OF DEFENDANT TO OTHER DOCTOR ADMISSIBLE.—In such prosecution, testimony of a doctor to the effect that defendant had discussed with him the preparation of a place "down the peninsula" for the handling of "long time [abortion] cases" was admissible, if the securing of such place entered into the particular offense for which defendant was being prosecuted, notwithstanding such evidence tended to prove that defendant was preparing to commit abortions generally.

[6] ID.—EFFORTS OF ACCOMPLICE TO AVOID DETECTION—ADMISSION OF STATEMENTS NOT PREJUDICIAL ERROR.—In such prosecution, the admission of testimony of police officers as to the actions of an

2. Proof of *corpus delicti* in prosecution for abortion, note, 68 L. R. A. 42, 49, 70.

4. Pregnancy as element of crime of abortion, note, 21 **Ann. Cas.** 522.

Admissibility in evidence of woman's statements made before or after operation, notes, 11 **Ann. Cas.** 217; **Ann. Cas.** 1913A, 531.

accomplice of defendant on the night the latter was arrested and of the statements she made in her efforts to avoid detection did not constitute error prejudicial to defendant where such accomplice did not say anything which had any relation to the defendant or that could have prejudiced him in any way.

[7] Id.—Performance of Other Abortion Operations—Evidence of Admissible to Show Intent.—In such a prosecution, evidence of the performance of other abortion operations by the defendant is admissible to show the intent with which the operation for the performance of which the defendant is being prosecuted was performed in order to negative the possibility that it was a legal operation necessitated by reason of the health of the woman.

[8] Id.—Error in Name of Deceased—Waiver of Variance.—On an appeal from the judgment of conviction in such prosecution error may not be predicated upon the fact that by inadvertence the given and middle names of the deceased were reversed in the information where a sister of the deceased connected the two names in her testimony and, further, the defendant did not make any motion in the trial court based upon the alleged variance, when it might have been readily explained and corrected.

[9] Id.—Failure to Give Instruction not Requested—Absence of Reversible Error.—Failure of the trial court to give a particular instruction is not ground for reversal where such an instruction is not asked.

APPEAL from a judgment of the Superior Court of San Mateo County. George H. Buck, Judge. Affirmed.

The facts are stated in the opinion of the court.

Hall C. Ross, Ross & Ross, Harry I. Stafford and Francis J. Mannix for Appellant.

U. S. Webb, Attorney-General, Franklin Swart and John H. Riordan, Deputy Attorney-General, for Respondent.

LANGDON, P. J.—This is an appeal by the defendant from a conviction of murder in the second degree. A great number of alleged errors are urged by the attorneys for the appellant upon a record which leaves no doubt of the guilt of the defendant. [1] The first contention is that the jury was not instructed as to what constitutes the crime of murder. The court instructed the jury with reference to the crime of murder in the second degree, and that was all that was necessary under the facts of this case. In the

case of *People* v. *Wright,* 167 Cal. 5, [138 Pac. 351], our
supreme court has said: "Under our law, where death re-
sults from the performance of an unlawful abortion, the
crime is murder in the second degree (Pen. Code, sec.
189), so if the defendant thus charged rests simply upon a
denial of the offense and no evidence of a lesser offense
is before the court and jury, the instructions should go
simply to murder in the second degree, and the verdict
should be either guilty as charged or not guilty." Instruc-
tions are to be given with reference to the facts of the case
proved. (*People* v. *Byrnes,* 30 Cal. 206, 207.)

[2] The next objections are to the introduction of cer-
tain photographs in evidence. One of the photographs was
identified as showing the place where the body was found,
with the surrounding brush and trees. Appellant objects
that evidence of the place where the body was found had no
relevancy. There was testimony from the physician who
examined the body after it had been found that death
had been caused by reason of the unsuccessful perform-
ance of an abortion operation. It was the theory of the
respondent that it became necessary for the state to prove
that the operation was unlawful; that is, that it was not a
necessary operation to preserve the life of the patient.
Upon this theory, as indirect evidence of this fact, it was
relevant to show that the body had been placed in a secluded
spot, where it was unlikely that it would be found. The
circumstances surrounding the finding of the body all indi-
cated that a crime had been committed and that the woman
had not died as the result of a lawful operation. For it
is reasonable to suppose that if the operation had been law-
ful and proper, the body of the woman would not have been
found in a secluded canyon or ravine. The photographs
were, therefore, relevant to explain the conditions under
which the body was found. The particular objection of the
defendant is that one of the pictures shows a small lizard
upon one of the rocks. We see nothing prejudicial to the
defendant in this. The picture of the scene was taken after
the body had been removed. We have examined it with
some care to find the lizard complained of, and by no stretch
of the imagination does it conjure up any of the horrors
which the attorney for the appellant fears may have
resulted in the minds of the jurors. Furthermore, when

objection was made to this picture, the district attorney stated: "Just a minute. There was an objection raised and I want to say that there was an objection raised or made because of something crawling on this picture and I don't care about that. I didn't know it was there and it may be stricken off. I am willing to have the clerk. mark it off or have her paste something over· it."

This objection, as well as several others urged by the appellant, involves the question of whether the state had the burden of establishing in the first instance that the operation was unnecessary for the purpose of preserving the life of the mother, or whether the burden of proving the affirmative of that proposition rested upon the defendant as an affirmative defense. It is, therefore, necessary for us to discuss that question here. In the case of *People* v. *Balkwell*, 143 Cal. 260, [76 Pac. 1017], the only case we have been able to find in this state upon this subject, the court says that there is a wide divergence of authority upon the question as to whether under a statute such as ours the burden of establishing that the abortion was actually necessary is an affirmative defense, or whether the proposition is to be negatived in the first instance by the prosecution. That case then proceeds upon the assumption that it was necessary for the prosecution to establish the fact that the operation was not necessary to preserve the life of the woman, and decides that even though that be true, yet in the case under consideration "the irresistible inference from the testimony is that it was not necessary to destroy the child to preserve the life of the mother." It appears, therefore, that this precise question has never been definitely decided in this state. We deem it unnecessary to decide the question here, for, assuming that the burden was upon the state in the first instance, the pictures introduced showing the conditions under which the body was found were relevant, as circumstantial evidence; and if this burden was not upon the state, we merely meet the proposition that the state has done more than was required of it in its proof. This in itself cannot be a ground of reversal, and we find nothing in the pictures themselves which could have been prejudicial to the defendant.

[3] The other photograph objected to is that of the body taken shortly after it was found. As pointed out

by the district attorney, this photograph was introduced
only after the defendant had raised a question about the
manner in which the body had been handled, as having some
bearing upon the distance the body had been carried before
being thrown down the embankment. It was necessary for
the prosecution to show that the crime had been committed
in the county in which the body was found and where the
trial was had. The only apparent purpose of the line
of questions pursued by the defendant upon this subject
was to establish that it was possible for the body to have
been brought a long distance and yet be in the condition
as testified to by the physician, provided it had been care-
fully handled and properly bandaged. The photograph
was then introduced by the state showing bruises on the
head and face as indicating that the body had not been care-
fully handled, and that it was, therefore, unlikely that it
could have been brought for any considerable distance with-
out the loss of much of the blood that was found in the
abdomen by the physician who examined the body.

Furthermore, when the question of the manner in which
this woman met her death was in issue, and evidence ap-
peared that certain abrasions were found upon the face and
head, it became important to explain whether or not these
abrasions were in any way connected with the cause of her
death. The prosecution introduced testimony of the physi-
cian who examined the body to the effect that they were
inflicted after death—and a picture taken after death, show-
ing the face and trunk of the body, fully clothed, was in-
troduced. We think it was relevant, to indicate that the
nature of these bruises and injuries was not such as to have
contributed to the death of the deceased.

And furthermore, the defendant was not injured, because
the picture was admissible for another reason: the body was
fully clothed and the picture clearly shows the coat and hat
which were identified in the courtroom by a sister of Miss
Inez Reed as having been the garments worn by her sister
when she was last seen by her. The picture was of value
in connecting the body found in the ravine with the cloth-
ing identified as having belonged to Miss Reed. The
defendant cannot be heard to complain that because the pho-
tograph is not a pleasant one to look upon, he was preju-
diced in the eyes of the jury because of the revulsion of

feeling that may have been caused by this picture. The entire record is a succession of most unpleasant and revolting verbal pictures, and whatsoever is ghastly in the facts of this case inheres in and is an inseparable part of such facts, and the defendant may not complain thereof.

[4] The next objection is to the testimony of Dr. Jordan that Inez Reed had visited his office some time during the week ending March 1st, and at that time she had told him she was in a condition of pregnancy of four or five months' duration and she had asked him to perform an abortion upon her; that he had refused and had given her the name and address of the defendant, which she had written in his presence upon a card. This testimony was not admitted for the purpose of proving the abortion, and it is conceded that it is not relevant for such purpose. The district attorney stated that the purpose was to prove the intention of Miss Reed when she left Dr. Jordan's office. The trial judge stated in his charge to the jury that "the declarations as to where the deceased was going prior to the act charged therein, were not admitted in evidence as proof of the commission of the crime of abortion, but simply as to the condition of the woman and the purpose of her visit if she made one, if they do show any light thereon." In *People* v. *Wright,* 167 Cal. 1, 8, [138 Pac. 349], the court says, in speaking of the admission of similar evidence, that it is not proper as direct proof of the commission of the abortion; but it is properly admitted as evidence establishing the condition of the woman and the avowed purpose of her visit. The appellant argues that the purpose of deceased's visit to Dr. Jordan's office does not tend to prove her purpose in visiting the defendant, if she did visit him. This may be conceded, but the testimony is nevertheless relevant upon the important question of her physical condition shortly before her death and her desire to be relieved thereof. For such purposes, we think the testimony complained of. in the present case was properly admitted.

[5] Defendant next objects to the testimony of Dr. Jordan to the effect that the defendant had discussed with him the preparation of a place "down the peninsula" for the handling of "long time [abortion] cases." As the objection is stated in the appellant's brief, we gather that it

is made upon the ground that such a project is larger in its scope than the commission of the one abortion operation under examination here, and, therefore, it should not be admitted because it is evidence tending to prove that the defendant was preparing to commit abortions generally. If the securing of this place entered into this particular crime, evidence in regard to it cannot become inadmissible by reason of the fact that it might have been used by the defendant for a number of similar operations if he had not been detected after the performance of the first one.

[6] It is contended that the police should not have been permitted to testify as to the actions of Frances Cronin on the night of the arrest of the defendant, when she slipped up the elevator to the fourth floor of the building in which defendant's office was located, and then walked down to the second floor and entered defendant's office; and to the statements made by said Frances Cronin when questioned by the police officers, to the effect that she had never been to the house in San Mateo, where the crime was supposed to have been committed, and as to her conduct and appearance at the Hotel Turpin at about 2 o'clock in the morning of March 9th. The same objection is urged against the testimony concerning the statement of Miss Cronin when she was shown a pair of her shoes which she had left at the San Mateo house. This latter testimony was that Miss Cronin denied ever having been to the house in San Mateo and, when shown her shoes, at first denied that they were her shoes—and when the detective suggested that she try them on—admitted that they were her shoes and that she had been to that house. There was also testimony to the effect that when she was asked about what she had been doing, she replied, ''Oh, the only thing to do is to take a dose of poison.'' Appellant's position upon this question is that the statements of a co-conspirator or accomplice after the object of the conspiracy has been accomplished are inadmissible. The correctness of this general statement is, of course, undisputed. While the language of our own supreme court in the case of *People v. Rodley,* 131 Cal. 240, [63 Pac. 351], might suggest that the efforts of co-conspirators to ''avoid detection and keep themselves out of the state prison'' were a part of their conspiracy— we think the situation presented in the present case

does not bring it within the meaning of the Rodley case; but even conceding appellant's claim that this was error, nevertheless it appears from an examination of all the testimony objected to upon this ground that Frances Cronin did not say anything which had any relation to the defendant or that could have been prejudicial to him. The questions of the police officers were directed to whether or not Frances Cronin had been to a certain house in San Mateo, and her answers were all a denial of this until she was shown a pair of her shoes which she had left at this house. In the case of *People* v. *Winters*, 125 Cal. 331, [57 Pac. 1069], it was said in speaking of the testimony of police officers as to their conversations with a man who had been a co-conspirator of the defendant in an attempt to rob a hotel: "Yet upon a careful examination of those declarations we find nothing therein stated which in any way was prejudicial to the defendant. His name was not mentioned. Nothing whatever was said to Raymond which even by implication connected him with the crime. . . . Therefore the admission of this evidence was purely abstract and furnished no ground for a new trial." We have carefully read all the testimony covered by these assignments of error and we are of the opinion that the error was not such as to call for a reversal of the case.

[7] Further objection is made to the testimony of Catherine Fisher in which she told of other abortion operations performed by the defendant previous to this case. While it is true, as a general rule, that upon a trial for a particular crime evidence which tends to show the commission of another and distinct offense by the defendant is inadmissible—the defendant has himself recognized and stated the exceptions to this rule—one of which applies to the present case. The exceptions are where it becomes necessary to show identity, intent, motive, etc. In the present case this evidence was introduced to show the intent with which the operation was performed, its motive, in order to negative the possibility that it was a legal operation necessitated by reason of the health of the woman. Because of the fact that the defendant denied ever having seen the woman—and because of the difficulties surrounding the proof in these cases generally—it was not possible to prove that this was a criminal operation except indirectly

and by circumstantial evidence. Evidence was, therefore, introduced to show that the defendant was engaged generally in this business and that he had previously performed other illegal operations. The precise point was discussed in the case of *People* v. *Hagenow,* 236 Ill. 514, [86 N. E. 370]. The court there said: "It was, therefore, necessary that the proof show and the jury find, in order to convict the plaintiff in error, that the miscarriage or abortion which was caused or produced upon Annie Horvatich was not caused by plaintiff in error to save the woman's life, and while the jury would have been justified in finding from the condition of the woman when she went to the plaintiff in error's place and the testimony of the physicians who made the post-mortem examination that no cause existed for the causing of a miscarriage or the producing of an abortion on Annie Horvatich to save her life, *the state was not required to rely upon this class of testimony alone, but had the right to show, if it could, that the plaintiff in error was not carrying on a hospital in a legitimate way for the treatment of women who were pregnant, but that she was a professional abortionist,* for the purpose of rebutting the presumption that she in good faith caused the miscarriage or produced the abortion upon Annie Horvatich to save her life, and for the purpose of showing that she must have known Annie Horvatich was pregnant and that she operated upon her with a criminal knowledge and intent to cause her to miscarry or to abort. . . . We think the view above expressed is fully sustained by this court in *Scott* v. *People,* 141 Ill. 195, [30 N. E. 329]; *Hagenow* v. *People,* 188 Ill. 545, [59 N. E. 242], and *Clark* v. *People,* 224 Ill. 554, [79 N. E. 941], and by numerous text-writers and adjudicated cases, 1 Ency. of Ev., p. 54, Underhill on Crim. Ev., sec. 345; *Regina* v. *Dale,* 16 Cox's Crim. L. C. 703, and other cases cited."

In the case of *People* v. *Seaman,* 107 Mich., at p. 357, [61 Am. St. Rep. 326, 65 N. W. 203], the court held that evidence similar to that objected to in this case was admissible. To the same effect is the case of *People* v. *Sessions,* 58 Mich., at p. 601, [26 N. W. 291].

It is conceded by both the appellant and respondent that this evidence is admissible in this class of cases where the burden is upon the state to negative the idea that the opera-

tion may have been necessary. But the appellant contends in this connection, as in the connection hereinbefore discussed, that the burden of establishing the fact that the operation was a necessary one to preserve the life of the mother was upon the defendant, and that as he did not put this defense in issue, and denied that he had performed any operation upon the deceased, or, indeed, that he had ever seen her, the state was not obliged to go into the question of the illegality of the operation, but the illegality would be presumed upon proof of the operation. But since the appellant concedes that the proof is proper where the state is called upon to do more than appellant contends it is called upon to do in the present instance, we are in the position, as stated before, where the state has sustained a greater burden than required. There is no failure of proof, but merely an excess of proof. Assuming that the proof was sufficient to connect the defendant with the performance of the operation upon deceased; the facts in evidence leave no doubt that there was no legal justification for the performance of the operation. They raise an "irresistible inference," as said in *People* v. *Wright, supra,* of the criminal character of the operation. And surely in view of the constitutional provision against setting aside judgments because of the improper admission or rejection of evidence unless it shall appear from an examination of the entire record that there has been a miscarriage of justice, we would not be justified in setting aside a verdict of the jury because the district attorney has proved more than was necessary in order to make out his case.

A number of errors are alleged upon the admission of evidence which was of minor importance, and we shall not discuss these matters in detail. It is sufficient to say that we consider these errors, if any, to be without prejudice to the defendant.

[8] Another assignment of error is predicated upon the fact that by inadvertence the name of the deceased was given as "Elizabeth Inez Reed" in the information, while the evidence gave the name as "Inez Elizabeth Reed." The defendant had been charged before a committing magistrate with the crime of the murder of "Inez Elizabeth Reed" in San Mateo County on or about March 7, 1919. He was held over, and later the information was filed

with the name written as ''Elizabeth Inez Reed'' instead of ''Inez Elizabeth Reed.'' A sister of the deceased, Mrs. Stevens, connected the two names in her testimony. She was asked if she knew Elizabeth Inez Reed in her lifetime, and she answered: ''My sister's name was Inez Elizabeth Reed.'' There is no reason of which we are aware why the defendant was prejudiced by this inadvertence, or hindered thereby in any way in the preparation of his defense. In the case of *People* v. *Lockwood,* 6 Cal. 205; the court said: ''The only argument that could be adduced in favor of a contrary rule, is that judgment in this proceeding would not be a bar to a future prosecution for killing J. T. Beatty. In such a case I apprehend it would be competent for the accused to establish by evidence *aliunde* that J. F. and J. T. Beatty were one and the same person. . . . In addition to all this the statute requires that these cases should be disposed of upon appeal without regard to technicalities. Under our system we are disposed to regard the error assigned as more nice than substantial.'' (See, also, *People* v. *Fick,* 89 Cal. 149, [26 Pac. 759]; *People* v. *Ah Sun,* 160 Cal. 791, [118 Pac. 240].) Furthermore, it appears that the defendant did not make any motion in the trial court based upon the alleged variance, when it might have been readily explained and corrected.

[9] The further contention is made that the evidence shows Dr. Jordan to have been an accomplice, and that the jury should have been so instructed. The record does not show that this question was ever raised at the trial, and does not show that any request for such an instruction was made, and it would appear that the contention that the testimony of Dr. Jordan proves him an accomplice is being made for the first time upon appeal. While we are of the opinion that the record does not show facts sufficient to make Dr. Jordan an accomplice under the language of *People* v. *Balkwell, supra,* yet it is unnecessary for us to decide this point here because failure of the court to give an instruction where such instruction is not asked is not ground for reversal. (*People* v. *Ah Wee,* 48 Cal. 236, 239; *People* v. *Fice,* 97 Cal. 459, 460, [32 Pac. 531]; *People* v. *Haun,* 44 Cal. 96, 100.)

Under the entire record before us we are convinced that there has been no miscarriage of justice, and that

none of the alleged errors complained of warrant a reversal of the judgment.

The judgment is affirmed.

Brittain, J., and Nourse, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on February 28, 1920, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 1, 1920, and the following opinion then rendered thereon:

THE COURT.—In denying the application for a hearing in this court after decision by the district court of appeal of the first appellate district, division two, we withhold any expression of opinion as to the admissibility under the circumstances of this case of the testimony of the witness Catherine Fisher concerning other abortion operations performed by the defendant previous to the alleged abortion involved in this case.

In view of the fact that the opinion of the district court of appeal states that the "record . . . leaves no doubt of the guilt of the defendant," and in view of section 4½ of article VI of the constitution, we would not be warranted in ordering a hearing in this court after decision by the district court of appeal affirming the judgment of the lower court, on account of the admission of such evidence if the same was erroneously admitted.

The application for a hearing in this court is denied.

All the Justices concurred.